**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

KEITH M. CULLER,                          :

       **Plaintiff**        :    **CIVIL ACTION NO. 3:09-0305**

   **v.**                                :

                                 **(MANNION, M.J.)**

ERIC K. SHINSEKI, Secretary of   :
the United States Veterans Affairs,

                     :

       **Defendant**

                     :

**M E M O R A N D U M**[1]

## I.   PROCEDURAL HISTORY

By way of relevant procedural background [2], the plaintiff filed the instant

action, (Doc. No. 1), on February 17, 2009, which he later amended on April

5, 2009, to include claims of age discrimination and retaliation (Count I), First

Amendment violations (Count II), and a hostile work environment (Count III),

in relation to his employment as an orthotist[3] at the Wilkes-Barre,

_____

[1]For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

[2]Because the parties are familiar with the procedural history and factual context of this case, only those facts relevant to the court's analysis are set forth herein.

[3]Orthotics is a clinical health profession concerned with the design, development, fitting and manufacturing of orthoses, which are devices that
(continued...)

Pennsylvania, Veterans Affairs, ("VA"), Medical Center, (Doc. No. 3).

After consideration of the defendant's initial motion for judgment on the pleadings, (Doc. No. 30), and subsequent motion for summary judgment, (Doc. No. 64), the only remaining claim in this action is whether the plaintiff was discriminated against on the basis of reprisal for prior EEO activity with regard to training. More specifically, whether a March 7, 2007, decision to rescind his previously approved travel to the National Training of VA Prosthetics/Orthotists Conference from March 19-24, 2007, in San Francisco, California, was in retaliation for is EEO filings.

Proposed findings of fact and conclusions of law were filed by the defendant, (Doc. No. 70), and the plaintiff, (Doc. No. 71), on August 26, 2011, and August 28, 2011, respectively.

A non-jury trial was held on the sole remaining claim on August 29, 2011, and August 30, 2011. At the trial, the court heard the testimony of the following current and former employees at the Wilkes-Barre VA Medical Center[4]: the plaintiff; Diane (Smith) Opiel, Chief of Staff Development; Bonnie Gurdock, Education Technician; Antoinette Germain-Tudgay, Chief of Rehab

---

[3](...continued)
support or correct musculoskeletal deformities and/or abnormalities of the human body.

[4]The titles provided are those which were held during the time relevant to the instant action.

and Prosthetics; Carmen Gene Molino, Associate Medical Center Director; Donald Foote, Finance Manager; and Linda Stout, Acting Medical Director.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court's findings of fact and conclusions of law follow.

## II.    FINDINGS OF FACT

The following findings of fact are based upon the stipulation of the parties, as well as the testimony and evidence which the court found credible as presented at the trial.

Among other things, the VA provides medical care through twenty-two Veterans Integrated Service Networks, which are known as VISNs. The Wilkes-Barre VA Medical Center is one of ten hospitals within VISN 4.

The plaintiff in this action is Keith Culler, who had worked as an orthotist at the Wilkes-Barre VA Medical Center from 1998 until April 1, 2007, when he went to a Baltimore, Maryland, VA facility to work as an orthotist.

Tony Germain-Tudgay is the Chief of the Rehab and Prosthetics Department at the Wilkes-Barre VA Medical Center, and has held that position for the past nine years. For the times relevant to the plaintiff's remaining claim, Ms. Germain-Tudgay was the plaintiff's direct supervisor at the Wilkes-Barre VA Medical Center.

On or about September 10, 2004, February 2, 2006, and May 10, 2007,

the plaintiff filed three formal EEO complaints raising multiple claims alleging age discrimination and/or retaliation for having engaged in protected activity against the VA. The plaintiff amended the second EEO complaint on March 3, 2006, and again on March 29, 2006.

In a November 14, 2006, memorandum, William Feeley, the Deputy Under Secretary of the VA for Health and Operations observed that the American Academy of Orthotists and Prosthetists, ("AAOP"), had offered to provide registration discounts to Veterans Health Administration, ("VHA"), orthotists and prosthetists for a scientific symposium being offered in San Francisco, California, from March 20-24, 2007. The symposium would include a one-day VA program to be presented on March 20, 2007. Mr. Feeley requested "that each VISN with **accredited** prosthetic and orthotic laboratories support travel and registration expenses for all certified prosthetists and orthotists as practical from each VISN to attend this symposium." (Emphasis in original). The cost of the training was $485.00 for tuition, plus another $1,962.14 for travel, hotel and meals. The funding for the conference would come from the Wilkes-Barre VA Medical Center facility funds, as opposed to VISN funds.

Chris Nowak, the Network Prosthetics Chief, forwarded the November 14, 2006, memo to Ms. Germain-Tudgay on November 20, 2006. She, in turn, forwarded the memorandum to the plaintiff on or about November 20,

2006, along with a form on which the plaintiff was to indicate whether or not he was interested in attending the conference. Upon completion, he was to return it to Ms. Germain-Tudgay.

Because the plaintiff did not believe that the clinic would be properly covered if he attended the conference, he initially chose not to attend. On November 27, 2006, he returned the form to Ms. Germain-Tudgay indicating that he was not interested in attending. Upon receipt of this response, Ms. Germain-Tudgay asked Union Representative John Shalanski to attempt to convince the plaintiff to attend the conference, as she felt the plaintiff was making his decision not to attend for the incorrect reasons. Additionally, she felt it would be beneficial to both the plaintiff and the Wilkes-Barre VA Medical Center patients for him to attend. Following Mr. Shalanski's conversation with the plaintiff, on November 29, 2006, the plaintiff submitted a request to attend the training.

In order to attend the conference, the Wilkes-Barre VA Medical Center required an applicant's immediate supervisor to approve or disapprove the training request and to indicate the priority – or value – of the training to the VA. On December 4, 2006, Ms. Germain-Tudgay approved the plaintiff's request to attend the conference and marked the priority as "high," as she felt the education committee would be more likely to approve her recommendation.

At the time the plaintiff submitted his request to attend the conference, all training requests required the approval of the immediate supervisor and the education committee. The plaintiff's training request was eventually approved by the education committee and signed by a member of the "Quadrad."[5] The plaintiff received a January 24, 2007, email from Bonnie Gurdock, Education Technician, confirming his approval to attend the San Francisco training.

On February 16, 2007, Ms. Germain-Tudgay sent an email to Alice Koprowski with a copy to Mr. Nowak. Ms. Germain-Tudgay requested Ms. Koprowski send Mr. Nowak the plaintiff's certification number. This was in response to a request for the certification numbers of those employees attending the San Francisco training.

On or about February 19, 2007, the plaintiff filed a complaint with the Office of Inspector General, ("OIG"), which was simultaneously forwarded to Gene Molino, the then Acting Director of the Wilkes-Barre VA Medical Center. Sometime thereafter, Ms. Germain-Tudgay received notice that an OIG complaint had been filed by the plaintiff.

On or about February 20, 2007, Ms. Germain-Tudgay learned that the

---

[5]The Quadrad was the term used to reference the four highest positions at the Wilkes-Barre VA Medical Center, which include the Director, the Associate Director, the Nurse Executive, and the Chief of Staff; it is currently referred to as the Executive Leadership Team, ("ELT").

plaintiff was leaving the Wilkes-Barre VA Medical Center to take a position as an orthotist with a Baltimore, Maryland, VA medical center. Ms. Germain-Tudgay advised Dr. Mizra Ali, the Chief of Staff of the Wilkes-Barre VA Medical Center, and Mr. Nowak of this information in an email on February 20, 2007.

On February 27, 2007, the plaintiff was sent his travel authorization orders to attend the San Francisco conference. It was authorized by Linda Stout, the Chief Nurse Executive and a member of the Quadrad.

While in the process of preparing his travel plans, the plaintiff learned of a proposed thirty-day disciplinary suspension. He became concerned that he might not be able to attend the conference. The plaintiff discussed this with Bonnie Gurdock, who, in turn, asked John Shalanski to investigate the matter. Mr. Shalanski indicated that he would speak with Ms. Germain-Tudgay and get back to Ms. Gurdock on the status of the suspension and the plaintiff's ability to attend the conference. Mr. Shalanski later informed Ms. Gurdock that, after speaking with Ms. Germain-Tudgay, the proposed suspension would not interfere with the plaintiff's ability to attend the conference and therefore Ms. Gurdock could proceed to finalize the plaintiff's travel arrangements.

On March 1, 2007, Ms. Germain-Tudgay met with Donald Foote, the Chief Fiscal Officer of the Wilkes-Barre VA Medical Center, to discuss

sending work out to the community because the plaintiff would be leaving the facility. Mr. Foote recalled having approved travel for the plaintiff and asked Ms. Germain-Tudgay why the plaintiff was being permitted to go on training, using Wilkes-Barre VA funds, when he would be leaving employment at the Wilkes-Barre VA Medical Center just a week later. Ms. Germain-Tudgay indicated that she was unaware that training could be cancelled. Mr. Foote advised her that the training could be cancelled, and further stated that he would cancel the training under the circumstances if it was his decision.

Mr. Foote and Ms. Germain-Tudgay then contacted Ms. Gurdock to inquire if the plaintiff's travel could be cancelled without incurring financial penalties or, if not, to determine the extent of any financial penalties. Ms. Gurdock advised them that there would be no financial penalty in cancelling the transportation and hotel, other than perhaps a small fee. As to the tuition expense, she indicated she would have to check further.

The director of the Wilkes-Barre VA Medical Center at this time was Gene Molino. However, because Mr. Molino was not in the office on March 1, 2007, Linda Stout was the Acting Director. She was, therefore, advised of the situation with respect to the plaintiff.

After her conversation with Mr. Foote and Ms. Germain-Tudgay, Ms. Gurdock called Dr. Diane (Smith) Opiel, Chief of Staff Development, her supervisor, and informed her of the call from Mr. Foote and Ms. Germain-

Tudgay inquiring into possible cancellation of the plaintiff's training because he was transferring to another facility. The discussion included the fact that, in the past, other individuals had been allowed to attend training even though they were scheduled to retire or resign. Ms. Gurdock did not know in those prior cases, however, if the individuals had advised their supervisors that they were retiring or resigning shortly. In light of this, Ms. Gurdock was looking for some guidance from Dr. (Smith) Opiel.

Later that afternoon, Ms. Gurdock sent an email to Mr. Foote and Ms. Germain-Tudgay, copying Dr. (Smith) Opiel, advising that a $75 fee would be charged for cancellation requests occurring before February 20, 2007, and that cancellation requests made after that date would be forwarded to the conference committee to determine if any refund would be granted. Mr. Foote replied to that email noting that the estimated travel was $1,962, plus tuition. He further stated "I can not [sic] understand why we would send some one to California and he will depart our medical Center a week later." Mr. Foote sent another email to everyone stating, "Please cancel this training."

As to Mr. Foote's original email, which questioned the wisdom of sending the plaintiff to California when he was leaving a week later, Ms. Germain-Tudgay responded by email that same day at 4:56 p.m. (to Mr. Foote and Ms. Gurdock, while copying Ms. Stout and Dr. (Smith) Opiel), stating "I concur. We need to cancel. Thanks." At 5:00 p.m. that same day,

9

Ms. Stout, the acting director, replied to the email and stated, "Cancel the education."

At the time the recommendation and decision to cancel the plaintiff's training was made, neither Mr. Foote, Ms. Stout, nor Dr. (Smith) Opiel were aware that the plaintiff had filed EEO complaints against the VA. Ms. Germain-Tudgay, however, was aware that the plaintiff had filed EEO complaints in that she had been the subject of the plaintiff's prior complaints.

On Monday, March 5, 2007, Ms. Gurdock advised Ms. Germain-Tudgay that the plaintiff would have to log in to Fed Traveler and cancel his hotel and airfare. Mr. Nowak in an email on March 7, 2007, asked if anyone had contacted the VA where the plaintiff was going to see if, as a possible alternative, it would split the cost or make some arrangement that would allow the plaintiff to receive the training without placing the financial burden on the Wilkes-Barre VA Medical Center which he was leaving. Ms. Germain-Tudgay responded to everyone, by email, stating that she thought the plaintiff was going to contact the Baltimore facility.

In a separate email on March 7, 2007, Ms. Germain-Tudgay suggested that, even if the other facility agreed to pay the cost of the plaintiff's training, he should not be allowed to attend because he would now be needed in Wilkes-Barre to train other staff as a result of his departure. Both Dr. Ali and Mr. Molino concurred. In addition, the Baltimore facility did not offer to cover

the cost of the training/conference. Later that day, Ms. Germain-Tudgay sent the plaintiff an email confirming that the medical center would not be able to support sending him to training in light of his forthcoming March 30, 2007, resignation. The plaintiff was directed to cancel his hotel and airfare.

With respect to any of the individuals who were previously allowed to go to training, despite the fact that they were leaving the facility, Ms. Germain-Tudgay neither supervised those employees, nor did she have any information which evidenced that their supervisors knew that they were leaving at the time their training was approved. Moreover, the costs associated with those past trainings were significantly less expensive as they only involved the use of a government vehicle for travel to drivable locations. Finally, with respect to these past instances, neither Mr. Foote nor Ms. Stout were made aware by either Ms. Gurdock or Dr. (Smith) Opiel that individuals were permitted to attend training despite the fact they were scheduled to leave employ at the facility.

## III.   DISCUSSION

Title VII "does not mandate a happy workplace." Sampath v. Concurrent Technologies Corp., 2008 WL 868215, *32 (W.D.Pa. Mar. 31, 2008) (citing Moore v. City of Philadelphia, 461 F.3d 331, 346 (3d Cir. 2006) (quoting Jensen v. Potter, 435 F.3d 444, 451 (3d Cir. 2006)). Further, "[i]t

does not require employers to treat all employees fairly, closely monitor their progress and insure them every opportunity for advancement." Id. (citing Ezold v. Block, Schorr and Solis-Cohen, 983 F.2d 509, 542 (3d Cir. 1992)).Title VII also does not transform the court into a "super-personnel department that reexamines an entity's business decisions." Id. (citing Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995)).

Instead, the anti-retaliation provision, 42 U.S.C. §2000e-3(a), makes it unlawful "for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [42 U.S.C. §2000e, et seq.] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. §2000e, et seq.]."

The framework for analyzing the plaintiff's Title VII retaliation claim proceeds under the familiar McDonnell Douglas[6] standard. Marra v. Philadelphia Housing Auth., 497 F.3d 286, 300 (3d Cir. 2007); Moore, 461 F.3d at 340-42. Initially, the employee bears the burden of establishing a *prima facie* case of retaliation. Moore, 461 F.3d at 341. If the employee establishes a *prima facie* case of retaliation, the burden of production shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment action. Id. at 342. If the employer meets its burden, the

---

[6] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

burden of production returns to the employee, who must now show, by a preponderance of the evidence, that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997))[7].

The *prima facie* case of retaliation requires a showing that (1) the employee engaged in a protected activity; (2) either contemporaneously with or after the activity, the employer took an action adverse to the employee; and (3) there was a "causal link between the adverse action and the protected activity." Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir.2007) (citing Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir.2001)).

Under the first prong of the *prima facie* retaliation case, the plaintiff's filing of formal complaints with the EEOC claiming age discrimination and retaliation constitutes protected activity. See Curay–Cramer v. Ursuline Academy of Wilmington, Delaware, Inc., 450 F.3d 130, 135 (3d Cir. 2006) (recognizing formal EEOC complaints, as well as informal complaints to management, qualify as protected activity for purposes of a retaliation claim). See also Moore, 461 F.3d at 343; Weston, 251 F.3d at 430. The first prong of the plaintiff's *prima facie* case is therefore satisfied.

---

[7]The Third Circuit has noted that the burden of persuading the trier of fact that the defendant intentionally retaliated against the plaintiff remains at all times with the plaintiff. Woodson, 109 F.3d at 920 n.2.

To satisfy the second prong of the *prima facie* case for retaliation, the plaintiff need only show that the employer's action was "materially adverse" in that it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore 461 F.3d at 342 (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). Whether an action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Burlington Northern, 548 U.S. at 71 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). Here, the plaintiff's previously approved training, which was directly related and significant to his area of expertise, was rescinded. Such actions could certainly have the effect of dissuading a reasonable worker from making or supporting a charge of discrimination and therefore the court finds the action was materially adverse under the second prong of the plaintiff's *prima facie* case.

Pursuant to the third prong of the *prima facie* case of retaliation, the plaintiff must show that the adverse action was motivated by "retaliatory animus," Farrell, 206 F.3d at 281, 284, and that this animus had a "determinative effect" on the complained-of decision. Woodson, 109 F.3d at 935. The plaintiff need not prove that retaliation was the sole reason for the

employer's decision, but only that it was a determinative factor of the employment decision, meaning that the action would not have been taken but for his protected activity. LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 231 -232 (3d Cir. 2007) (citing Watson v. SEPTA, 207 F.3d 207, 215 (3d Cir. 2000); Caver v. City of Trenton, 420 F.3d 243, 267 (3d Cir. 2005)). The Third Circuit "has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." Abramson v. William Paterson Coll., 260 F.3d 265, 288 (3d Cir. 2001) (citing Farrell, 206 F.3d at 281 and Woodson, 109 F.3d at 920-21)). However, in making the determination of whether the plaintiff has established a causal connection between the protected activity and the adverse action taken, the court may consider "a broad array of evidence." Farrell, 206 F.3d at 281, 284 (citation omitted).

The "unusually suggestive" temporal proximity of the employer's and employee's actions can by itself establish the necessary causal link. See LeBoon, 503 F.3d at 232 (citing Clark County, 532 U.S. at 273-74; Jalil, 873 F.2d at 708). A lack of temporal proximity is not fatal, however, and the passage of "almost two years" or indeed any period of time, is "not legally conclusive proof against retaliation." Robinson v. Southeastern Pennsylvania Transp. Authority, Red Arrow Div., 982 F.2d 892, 894-95 (3d Cir. 1993). It is clear, however, the protected activity and alleged retaliation must be

extremely close in time for such proximity to raise an inference of discrimination on its own. For example, the Third Circuit has held that two days between protected activity and an adverse action is "unusually suggestive" of retaliatory motive, <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 208 (3d Cir. 1989), but that three months is not, <u>LeBoon</u>, 503 F.3d at 233.

In this case, the record reflects that, prior to the rescission of his training, the plaintiff filed an EEO complaint on September 10, 2004, and a complaint on February 2, 2006, which was later amended on March 3, 2006, and again on March 29, 2006[8]. This activity occurred almost one year before the rescission of the plaintiff's training. Although the plaintiff filed an OIG complaint on February 19, 2007, just weeks before the approval for his training was rescinded, and simultaneously mailed a copy to the attention of Gene Molino at the VA Medical Center, there is no indication as to when the complaint was actually received or when Ms. Germain-Tudgay received notice of the complaint so as to indicate that it played any part in the decision to rescind the plaintiff's training. In light of the passage of time between the known protected activity and the adverse action, the court finds that the timing of the adverse action is not unusually suggestive of retaliatory motive.

Where temporal proximity is not unusually suggestive on its own, the

---

[8]As indicated above, the plaintiff filed a third EEO complaint on May 10, 2007; however, that was after the adverse action at issue in this case.

court looks to the evidence, as a whole, to determine whether it is sufficient to raise an inference of retaliation. Farrell, 206 F.3d at 280. In making this determination, the court may consider intervening antagonism or retaliatory animus, inconsistencies in the employer's proffered reasons for taking the adverse action, or any other evidence in the record sufficient to support the inference of retaliatory animus. Id. at 279-81. Intervening antagonism or retaliatory animus must have arisen at the time of or after the protected activity. LeBoon, at 233-34; see also Robinson, 982 F.2d at 895 (finding that the employer subjected the employee to a "constant barrage" of abusive behavior, "all of which occurred soon after plaintiff's initial complaints and continued until his discharge"). If the plaintiff cannot show that the relationship in question became "qualitatively different" after the protected activity, he cannot meet his burden with this factor. LeBoon, 503 F.3d at 233.

Here, the record reflects strained relations between the plaintiff and Ms. Germain-Tudgay from the start. In fact, the plaintiff testified that from the instant Ms. Germain-Tudgay became his supervisor their relationship was strained, in that she downgraded his position, suspended him and denied him leave. There is nothing to indicate that these relations were any different after the filing of the plaintiff's EEO complaints. As the plaintiff has failed to show that his relationship with Ms. Germain-Tudgay became any different after he engaged in protected activity, he has not met his burden with regard to this

factor.

In addition, the plaintiff has failed to establish any inconsistencies in the proffered reason for rescinding approval for the training. It has consistently been maintained that the decision to rescind approval for the plaintiff's training was based upon financial considerations and what would be most beneficial to the Wilkes-Barre VA Medical Center, and not retaliation. Training was approved by Ms. Germain-Tudgay for the plaintiff based upon the fact that it would be beneficial to the plaintiff, a Wilkes-Barre VA Medical Center orthotist, and the veterans served by him at that facility. The monies for the plaintiff's training were coming from the Wilkes-Barre VA Medical Center's funds. Once it was discovered that the plaintiff was transferring to a Maryland VA medical center, it was determined that it was no longer fiscally sound to utilize the Wilkes-Barre VA Medical Center's funds to train an individual who would no longer be of benefit to veterans who utilized their facility. The record reflects that, other than the plaintiff informing Ms. Germain-Tudgay that he was transferring to another facility, there were no intervening factors to provide the defendant with a reason to rescind approval for the training. Whether or not the defendant's reasons for rescinding the plaintiff's training was a good decision or a morally sound decision is not an issue for the court. As discussed above, it is not for the court to reexamine the business decisions of the defendant, but to determine, at this step of the

*prima facie* case, whether the protected activity engaged in by the plaintiff was a determinative factor in the decisions made and the actions taken by the defendant. The court finds that it was not.

In addition to considering any intervening antagonism or retaliatory animus or any inconsistencies in the proffered reasons for the adverse actions taken, the court may consider any other evidence of record which is sufficient to support the inference of retaliation. Here, the court has heard no such evidence. The plaintiff has made much of the relationship between himself and Ms. Germain-Tudgay in attempting to support his claim of retaliation. However, the record indicates that, in fact, it was Ms. Germain-Tudgay that was the moving force behind having the plaintiff attend the training in the first place. Upon receipt of the memorandum regarding the training, she immediately checked into the benefits of having the plaintiff attend the training and forwarded the memorandum to the plaintiff indicating that he should go. When the plaintiff expressed concern that the clinic would not be adequately covered in his absence, Ms. Germain-Tudgay indicated that she would handle the clinic in his absence. When the plaintiff returned the form indicating that he did not wish to attend the training, Ms. Germain-Tudgay asked John Shalanski to talk to the plaintiff and encourage him to attend as it would be beneficial to both the plaintiff and the veterans who sought care at the Wilkes-Barre VA Medical Center. Ultimately, the plaintiff

was convinced to go to the training and submitted a request to do so. Ms. Germain-Tudgay approved that request and indicated to the education committee that it ranked "high" in value in order to better assure that the plaintiff's training would be approved. There is simply no evidence in the record that Ms. Germain-Tudgay took all of these steps to get the plaintiff to attend the training, only to then have the training rescinded as a form of retaliation against the plaintiff.

In addition, the court notes that, other than Ms. Germain-Tudgay, none of the individuals involved in the decision to rescind the approval for the plaintiff's training, including Ms. Stout, the ultimate decisionmaker, were aware of the previous EEO complaints filed by the plaintiff, lending further support to the court's finding that the decision to rescind training was not motivated by retaliatory animus[9].

_____

[9]The court notes that there has been a split among the courts as to what circumstances will justify imputing an employee's animus to an otherwise unbiased ultimate decisionmaker. While the Third Circuit never directly addressed the split on this issue, in Abramson v. William Paterson Coll. of N.J., 260 F.3d 265 (3d Cir. 2001), the Third Circuit described its own decisions as allowing plaintiffs to recover if they could show that a biased non-decisionmaker "influenced or participated" in the adverse employment decision. Id. at 286 ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995)).

Recently, the United States Supreme Court addressed "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who
(continued...)

Moreover, the plaintiff relied heavily upon the fact that there were other individuals who were either retiring or resigning from the Wilkes-Barre VA Medical Center who were allowed to attend training. On this matter, the plaintiff offered insufficient evidence in the record with respect to these individuals to conclude that the plaintiff was not allowed to go to the training as a form of retaliation for his actions in filing EEO complaints. The circumstances surrounding the allowance of these other individuals to attend training, despite the fact that they subsequently resigned or retired from the facility, could have been completely different from the plaintiff's. In fact, the evidence of record is that the travel associated with these individuals was significantly less expensive than that of the plaintiff's. Moreover, there is no

---

[9](...continued)

influenced, but did not make, the ultimate employment decision." Staub v. Proctor Hosp., — U.S. —, 131 S.Ct. 1186, 1189 (2011). In doing so, the Court rejected the test relied upon by the Seventh Circuit, which would hold an employer liable in such a circumstance only if the non-decisionmaker exerted such "singular influence" over the decisionmaker as to make the decision no more than a rubber stamp of the non-decisionmaker's recommendation, and instead stated that the correct test of employer liability was one of proximate cause. Id. at 1194.

In considering the application of Staub to the instant action, however, there is first a requirement that there be discriminatory animus on the part of the non-decisionmaker in order to impute that animus to the ultimate decisionmaker. Because the court has found that the actions of Ms. Germain-Tudgay were not motivated by retaliatory animus, the test set forth by Staub is inapplicable to the ultimate decision by Ms. Stout to rescind the plaintiff's approval for training.

21

evidence in the record with respect to whether the supervisor(s) of these individuals were aware, at the time that the training was approved, that they were leaving the facility. As such, the court finds that the circumstances surrounding these individuals cannot be used to infer that the denial of the plaintiff's training was a form of retaliation.

In light of the above, the court finds that the plaintiff has failed to establish a *prima facie* case of retaliation. However, even if he had, the defendant has come forth with evidence indicating that the actions taken against the plaintiff were for legitimate, non-retaliatory reasons. Specifically, the defendant has presented testimony that the funds that were paying for the plaintiff's training would be coming from the Wilkes-Barre VA Medical Center's funds, and that the Wilkes-Barre VA Medical Center and its veterans would ultimately not benefit from the plaintiff's training if he transferred to the Maryland facility one week later. Therefore, in order to save those funds for programs that would benefit the Wilkes-Barre facility and veterans who used that facility, the decision was made to cancel the plaintiff's training.

Given the fact that the defendant has proffered legitimate, non-retaliatory reasons for its actions, the burden shifts to the plaintiff to establish that the defendant's reasons are pretextual. To establish pretext, the plaintiff "must point to some evidence, direct or circumstantial, from which a

22

factfinder could reasonably either (1) disbelieve the employer's articulated, legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994). As discussed above, the court has found that the reasons proffered by the defendant for the rescission of training are credible. Moreover, the plaintiff has failed to point to any evidence in the record that would indicate that retaliation was more likely than not a motivating cause of the defendant's decision to rescind his training.

## IV.   CONCLUSIONS OF LAW

Based upon the court's findings of fact and discussion, as set forth above, the court concludes that the plaintiff has failed to establish a *prima facie* case of retaliation in that he has failed to establish a causal link between the protected activity engaged in and the adverse actions taken by the defendant. Moreover, the defendant has proffered legitimate, non-discriminatory reasons for why the plaintiff's approval to attend the March 2007 conference was rescinded. The plaintiff has not established that the defendant's reasons for rescinding approval to attend the March 2007 conference were pretextual or motivated by his having filed EEO claims or otherwise for engaging in protected activity. The defendant is therefore

entitled to judgment on the plaintiff's retaliation claim.

In light of the foregoing, an appropriate order shall enter.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date: December 30, 2011**

O:\shared\MEMORANDA\2009 MEMORANDA\09-0305-04.wpd

24